**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STERLING FEDERAL BANK, F.S.B., individually, and on behalf of ALTERNATIVE LOAN TRUST 2004-15, CHL MORTGAGE PASS-THROUGH TRUST 2004-22, CHL MORTGAGE PASS-THROUGH TRUST 2005-HYB6, and ALTERNATIVE LOAN TRUST 2006-26CB, | ) ) ) ) ) ) ) | |
|         Plaintiff, | ) ) | No. 11-cv-2012 |
|         v. | ) ) | |
| COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE SECURITIES CORPORATION, COUNTRYWIDE CAPITAL MARKETS, LLC, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE HOME LOANS SERVICING LP, CWMBS, INC., CWALT, INC., BANK OF AMERICA CORP., BAC HOME LOANS SERVICING, L.P., NB HOLDINGS CORPORATION, and THE BANK OF NEW YORK MELLON, | ) ) ) ) ) ) ) ) ) ) ) | |
|         Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

In this action, Plaintiff Sterling Federal Bank, F.S.B. ("Sterling") asserts two claims for breach of fiduciary duty and three claims for breach of contract against the Bank of New York Mellon (the "Bank") as Trustee of certain trusts of which Sterling is a certificateholder. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. The Bank has moved to dismiss Sterling's Complaint under Federal Rule of Civil Procedure ("Rule") 12(b)(6) and under the Supreme Court's decision in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976). For the following reasons, the Court

denies the Bank's motion to dismiss, but stays Counts I and II pending final disposition of *In re the Application of the Bank of New York Mellon* (N.Y. Sup. Ct. No. 651786/2011).

## INTRODUCTION

On March 23, 2011, Sterling filed a multi-count Complaint, individually, against Countrywide Financial Corporation ("Countrywide"), Countrywide Securities Corporation, Countrywide Capital Markets, LLC, Countrywide Home Loans, Inc., Countrywide Home Loans Servicing LP, CWMBS, Inc., CWALT, Inc., Bank of America Corporation, BAC Home Loans Servicing, L.P., and NB Holdings Corporation (collectively, the "Countrywide Defendants") in this Court, based on various alleged misrepresentations and omissions regarding Countrywide's mortgage-backed securities ("MBS") offerings. (R. 1, Compl., Counts I-VI.) In the same complaint, Sterling, derivatively on behalf of Alternative Loan Trust 2004-15, CHL Mortgage Pass-Through Trust 2004-22 ("2004-22"), CHL Mortgage Pass-Through Trust 2005-HYB6 ("2005-HYB6"), and Alternative Loan Trust 2006-26CB ("2006-26CB") (collectively, the "Trusts") asserted three breach of contract claims against the Bank. (*Id.*, Counts VII-IX.) On August 15, 2011, the United States Judicial Panel on Multidistrict Litigation (the "MDL Panel") entered an order transferring Sterling's claims against the Countrywide Defendants to the United States District Court for the Central District of California. The MDL Panel simultaneously separated and remanded Sterling's claims against the Bank to this Court on the grounds that those claims are "distinct from claims made against the Countrywide [D]efendants" alleging misrepresentations and omissions in Countrywide's [MBS] offerings. (R. 33-1 at 3.)

On September 29, 2011, Sterling, derivatively on behalf of the Trusts, filed an Amended Complaint in this Court against the Bank, again asserting three breach of contract claims. (R. 46, Am. Compl.) The Bank moved to dismiss the Amended Complaint on October 12, 2011.

(R. 49.)  The Court thereafter granted Sterling's request to file a Second Amended Complaint

(R. 57, 59), and accordingly denied, without prejudice, the Bank's motion to dismiss the

Amended Complaint as moot.  (R. 61.)

On December 5, 2011, Sterling filed a Second Amended Verified Certificateholder

Derivative Complaint, and on December 8, 2011, a Corrected Second Amended Verified

Certificateholder Derivative Complaint, asserting two breach of fiduciary duty claims and three

breach of contract claims.  (R. 60, 62.)  The Bank moves to dismiss of all five claims, or, in the

alternative, dismiss of the breach of contract claims and stay Sterling's fiduciary duty claims.

On June 18, 2012, after the parties had fully briefed the Bank's motion, the Court ordered

Sterling to file a Third Amended Complaint to properly allege diversity jurisdiction.  Sterling did

so on June 20, 2012.  (R. 91.)  The Third Amended Complaint's non-jurisdictional allegations

are identical to those in the Corrected Second Amended Verified Certificateholder Derivative

Complaint.  The Court refers to the Third Amended Complaint throughout this Memorandum

Opinion and Order as the "TAC" or the "Complaint."

## FACTUAL BACKGROUND

This case involves Sterling's investment in the Trusts and the Bank's conduct as Trustee.

As the Second Circuit recently explained in a case involving the very facts of this case:

> To raise funds for new mortgages, a mortgage lender sells pools of mortgages into
> trusts created to receive the stream of interest and principal payments from
> mortgage borrowers.  The right to receive trust income is parceled into certificates
> and sold to investors, called certificate-holders.  The trustee hires a mortgage
> servicer to administer the mortgages by enforcing the mortgage terms and
> administering the payments.  The terms of the securitization trusts as well as the
> rights, duties, and obligations of the trustee, seller and servicer are set forth in a
> Pooling and Servicing Agreement.

*BlackRock Fin. Mgmt. Inc. v. Segregated Account of Ambac Assurance Corp.*, 673 F.3d 169 (2d

Cir. 2012).  In support of its claims, Sterling makes the following allegations, which the Court

accepts as true for purposes of the Bank's motion.  *See AnchorBank, FSB v. Hofer*, 649 F.3d 610,

614 (7th Cir. 2011).

## I.    The Parties

Sterling is a federally-chartered savings bank.  (R. 62, TAC ¶ 6.)  Its main office, as

stated in its Articles of Incorporation, and its principal place of business are located in Sterling,

Illinois.  (*Id*.)  It is a certificateholder of the Trusts.  (*Id.* at Caption & ¶ 1.)  The Bank is a state-

chartered bank, incorporated in New York.  (*Id.* ¶ 7.)  Its principal place of business is located in

New York, New York.  (*Id*.)  At all relevant times, the Bank served as the Trustee of the Trusts

for the benefit of the certificateholders.  (*Id*.)

## II.    The Mortgage Securitizations

The creation of the Trusts occurred as follows.  Non-party Countrywide Home Loans,

Inc. (the "Seller") originated or acquired "sub-prime" residential real estate mortgage loans.  (*Id.*

¶ 37.)  The Seller sold those loans to CWALT, Inc. and CWMBS, Inc. (collectively, the

"Depositor"), which conveyed the loans to the Bank, as Trustee, for the benefit of the Trust.

(*Id.*, Ex. I, Pooling and Servicing Agreement ("PSA"), §§ 2.01(a)-(b).[1])  The Depositor issued

certificates to certificateholders, representing beneficial ownership in the Trusts.  (TAC ¶ 37.)

The collateral for the certificates is the particular Trust's sub-prime residential real estate

mortgage portfolio.  (*Id*.)  The "Master Servicer," Bank of America, N.A. (formerly Countrywide

Home Loans Servicing L.P.) is responsible for collecting payments from borrowers, making

---

[1]  The PSAs are attached as Exhibits I-L to the Complaint.  Because the terms of each
relevant PSA are materially identical, the Court cites to the PSA attached to the Complaint as
Exhibit I for clarity and convenience.

monthly payments to the Bank for distribution to certificateholders, and, if necessary, foreclosing on properties with defaulted loans. (*Id.* ¶ 46; PSA §§ 3.01, 3.11.) The Bank, as Trustee, administers the Trusts. (TAC ¶ 7.)

The Seller, the Master Servicer, and the Bank, among others, entered into certain PSAs, which set forth their respective obligations relating to the Trusts. (*Id.* ¶¶ 40, 45-52, 54.) Sterling alleges, and the Bank does not dispute, that it and other certificateholders are third-party beneficiaries of the PSAs. (*Id.* ¶ 44.)

In the PSAs, the Seller made certain representations and warranties with respect to the quality of the mortgage loans in the portfolio. (*Id.* ¶ 45.) The Seller represented, for example, that each mortgage loan was underwritten in accordance with Countrywide's underwriting guidelines set forth in the prospectus supplement and that no fraud or other omission had taken place with respect to the mortgages loans. (*Id.* ¶¶ 45(c)-(d).) The Seller further agreed that, upon discovery of any breach of a representation or warranty that materially and adversely affects the certificateholders' interests, it would cure the breach or, under certain circumstances, would have the alternative options to either purchase the loan that caused the breach or supply a substitute mortgage loan for the loan that caused the breach. (*Id.* ¶ 45(f).)

Moreover, the PSAs require the Master Servicer to enforce the Seller's obligation to cure, repurchase, or substitute any mortgage loan that causes a breach, as described above. (*Id.* ¶ 46 (citing PSA § 3.01).) The PSAs further require the Master Servicer to provide loan-level information for each mortgage loan to the Bank as set forth in Schedule VI of the PSAs. (*Id.* ¶ 50.) Additionally, the PSAs provide that the Bank must provide monthly statements to

certificateholders and credit rating agencies,[2] including the Special Hazard Loss Coverage Amount,[3] the Fraud Loss Coverage Amount,[4] and the Bankruptcy Loss Coverage Amount,[5] based on information that the Master Servicer provides to it. (TAC ¶ 52; PSA § 4.06(xv).) The PSAs further require the Bank to "use its best efforts to promptly provide notice" to each rating agency once it has actual knowledge of an Event of Default that the Seller has not cured. (TAC ¶ 51; PSA § 10.05(2).)

---

[2] The relevant rating agencies are Moody's Investors Service ("Moody's") and Standard & Poor's ("S&P"). *See* PSA, Art. I and Prelim. Stmt.

[3] The PSAs define the Special Hazard Loss Coverage Amount as follows: "With respect to the first Distribution Date, $5.980,000. With respect to any Distribution Date after the first Distribution Date, the lesser of (a) the greatest of (i) 1% of the aggregate of the principal balances of the Mortgage Loans, (ii) twice the principal balance of the largest Mortgage Loan and (iii) the aggregate of the principal balances of all Mortgage Loans secured by Mortgaged Properties located in the single California postal zip code area having the highest aggregate principal balance of any such zip code area and (b) the Special Hazard Loss Coverage Amount as of the Closing Date less the amount, if any, of Special Hazard Losses allocated to the Certificates since the Closing Date. All principal balances for the purpose of this definition will be calculated as of the first day of the calendar month preceding the month of such Distribution Date after giving effect to Scheduled Payments on the Mortgage Loans then due, whether or not paid." (PSA, Art. I.)

[4] The PSAs describe the "Fraud Loss Coverage Amount" as follows: "[a]s of the Closing Date, $6,000,000, subject to reduction from time to time by the amount of Fraud Losses allocated to the Certificates." (*Id.*) "Fraud Losses," in turn, are "Realized Losses on Mortgage Loans as to which loss is sustained by reason of a default arising from fraud, dishonesty or misrepresentation in connection with the related Mortgage Loan, including a loss by reason of the denial of coverage under any related Primary Insurance Policy because of such fraud, dishonesty or misrepresentation." (*Id.*)

[5] The PSAs provide that the "Bankruptcy Loss Coverage Amount" shall, as of any date of determination, "equal the Initial Bankruptcy Coverage Amount as reduced by (i) the aggregate amount of Bankruptcy Losses allocated to the Certificates since the Cut-off Date and (ii) any permissible reductions in the Bankruptcy Loss Coverage Amount as evidenced by a letter of each Rating Agency to the Trustee to the effect that any such reduction will not result in a downgrading of the then current ratings assigned to the Classes of Certificates rated by it." (*Id.*)

### III.    Sterling's Purchase of Countrywide MBS

From 2004 to 2006, Sterling purchased "a substantial portion" of four separate tranches[6] of certificates in the Trusts, identified as 2004-15 2A2, 2004-22 M, 2005-HYB6 5A2, and 2006-26CB A 19 (the "Tranches").  (TAC ¶ 35.)  The Trusts utilize a senior/subordinated structure, whereby tranches of the certificates are layered such that each tranche benefits from the credit protection of all of the tranches subordinated to it.  (*Id*. ¶ 36.)  The Tranches that Sterling purchased were senior certificates, such that the rights of the holders of subordinated tranches of certificates were subordinate to Sterling's rights.  (*Id*.)  Accordingly, the subordinated tranches of the certificates were to provide credit support for the senior tranches.  (*Id*.)  Sterling still owns the Tranches.  (*Id*.)

To facilitate the sale of the certificates, Countrywide and its affiliates published prospectuses and supplements thereto regarding the sale of certificates on April 23, 2004 and July 23, 2004 (as to 2004-15); on August 24, 2004 and September 27, 2004 (as to 2004-22); on July 25, 2005 and August 26, 2005 (as to 2005-HYB6); and March 27, 2006 and July 27, 2006 (as to 2006-26CB).  (*Id*. ¶ 38.)  The Bank, as Trustee, contributed to the content of the prospectuses and supplements thereto, and consented to issuing both.  (*Id*. ¶ 39.)

### IV.    The Alleged Countrywide Fraud

Underlying Sterling's Complaint is an alleged massive fraud that Countrywide and certain of its officers and affiliates perpetrated.  (*Id.* ¶ 9.)  Specifically, Sterling alleges that Countrywide made false representations about its "purportedly conservative mortgage

---

[6] A tranche is "[a] bond issue derived from a pooling of similar debt obligations." Black's Law Dictionary (9th Ed. 2009).  "A tranche usu[ally] differs from other issues by maturity date or rate of return."  *Id.*

underwriting standards, the appraisals of mortgaged properties, adherence to prudent underwriting guidelines and careful credit analysis, the mortgages' loan-to-value ratios, and other facts that were material to investment decisions." (*Id.* ¶ 11.) According to Sterling, Countrywide had no intention of abiding by its representations and warranties to investors. (*Id.* ¶ 25.) Sterling avers that Countrywide's deviation from its represented underwriting practices resulted in approval of loans in cases where loan applications lacked important documentation, included an invalid or incomplete appraisal, demonstrated borrower fraud on the face of the loan application, or reflected that the borrower's financial information failed to meet stated guidelines. (*Id.* ¶ 31.) Relevant to its case against the Bank, Sterling alleges that the Master Servicer, among other things, did not enforce the Seller's obligations under the PSAs to cure or repurchase mortgage loans as to which a breach of a representation or warranty occurred. (*Id.* ¶¶ 45, 53-56; PSA § 2.03.)

## V.     The Bank's Relevant Conduct

### A.      Failure to Provide Information to Credit Rating Agencies and Certificateholders

Sterling alleges that investors commonly rely on the credit rating agencies' ratings in deciding whether to maintain particular securities in their portfolios. (TAC ¶ 67.) The Bank allegedly failed to provide monthly statements to the rating agencies that included the Special Hazard Loss Coverage Amount, the Fraud Loss Coverage Amount and the Bankruptcy Loss Coverage Amount. (*Id.* ¶¶ 132, 134.) Sterling also alleges that the Bank knew that the credit agencies' ratings of the certificates were falsely maintained and that the Seller and Master Servicer had abandoned their obligations under the PSAs. (*Id.* ¶ 70.)

8

S&P and Moody's drastically downgraded the certificates at issue years after Sterling purchased them.  (*Id.* ¶ 68.)  Below are S&P's and Moody's ratings of the certificates at issue, as alleged in the Complaint.  (*Id.* ¶¶ 40 n.5, 68 n.7.)

| Certificates/Tranches | S&P | Moody's |
|---|---|---|
| **2004-15 2A2** | **April 23, 2004**:  AAA ("an extremely strong capacity to meet financial commitments")<br><br>**December 30, 2009**:  CCC ("currently vulnerable and dependent on favorable business, financial and economic conditions to meet financial commitments") | Not alleged |
| **2004-22 M** | **August 24, 2004**: AA ("a very strong capacity to meet financial requirements")<br><br>**December 9, 2009**:  B- (a B rating means "more favorable to adverse business, financial and economic conditions but currently has the capacity to meet financial commitments" and a (-) denotes a lower relative standing within the rating category) | **August 24, 2004:**  Aa2 (an Aa rating indicates "high quality" and "subject to very low credit risk" and a modifier of 2 indicates a mid-range ranking of the generic category)<br><br>**April 15, 2010:**  Caa1*- ("judged to be of poor standing" and "subject to very high credit risk" with the modifier of 1 indicating that the obligation ranks in the higher end of its generic rating category and the (*-) indicating that the obligation has been placed on "Credit Watch Negative" and will likely suffer more ratings downgrades) |

| 2005-HYB6 5A2 | September 25, 2005: AAA | September 25, 2005: Aa1 (modifier of 1 indicates that the obligation ranks in the higher end of its generic rating category) |
| | July 1, 2009: CCC | April 15, 2010: C ("the lowest rated class and are typically in default, with little prospect for recovery of principal or interest") |
| 2006-26CB A19 | July 28, 2006: AAA | July 28, 2006: Aa1 |
| | August 15, 2010: D (indicates "payment default on financial commitments") | July 12, 2010: C |

Sterling alleges that had the rating agencies gradually downgraded the certificates earlier to reflect the problems with loan delinquencies and insurance, it and other certificateholders would have sold the securities before their value further decreased. (*Id.* ¶ 69.)

According to Sterling, the Bank also failed to provide information to certificateholders that it was permitted to request from the Master Servicer and which the Master Servicer had an obligation to provide. (*Id.* ¶¶ 52, 64.) The Bank did not provide monthly statements to certificateholders regarding the Special Hazard Loss Coverage Amount, Fraud Loss Coverage Amount and the Bankruptcy Loss Coverage Amount. (*Id.* ¶¶ 142-44.)

### B. Event of Default

Sterling further alleges that the Bank failed to provide certificateholders with notice of an "Event of Default" under § 7.01 of the PSAs, despite knowing that several defaults had occurred. (*Id.* ¶¶ 77-79, 119-22.) On October 18, 2010, a group of certificateholders (the "Institutional Investors") holding at least 25% of the voting rights in certificates issued by 115 trusts, including

2004-22, provided the Bank and the Master Servicer notice of the Master Servicer's material failures to perform its obligations under the PSAs (the "Notice"). (*Id.* ¶¶ 75-76.) The Notice listed several specific failures and noted that each failure was continuing and materially affected the certificateholders' rights. (*Id.* ¶ 77.) Additionally, the Notice stated that if the failures continued for 60 days from the date of the Notice, each of them–independently–would constitute an Event of Default under the PSAs. (*Id.*) Nevertheless, the failures continued for an additional 60 days from the Notice date. (*Id.* ¶ 78.)

Sterling contends that the Bank knew that the Master Servicer failed to (1) enforce the Seller's obligations under the PSAs; (2) use reasonable efforts to foreclose upon defaulted mortgage loans, and (3) supply it with complete information regarding the mortgage loans. (*Id.* ¶ 60.) Sterling further alleges that assuming the Bank made the requisite demands on the Master Servicer, then the Bank knew that the Master Servicer's inactions continued despite the Bank's demands, thereby creating an Event of Default under § 7.01(ii) of PSAs. (*Id.* ¶ 61.) Alternatively, Sterling avers that if the Bank failed to make the requisite demands on the Master Servicer, then the Bank failed to comply with the PSAs. (*Id.*)

## VI.    The Countrywide Settlement Agreement and the Article 77 Proceeding

On June 29, 2011, the Bank announced that it had entered into a settlement agreement with Countrywide to settle, for $8.5 billion, "all potential claims belonging to" 530 trusts for which the Bank serves as trustee (the "Settlement Agreement").[7] (TAC ¶ 80.) Prior to that time, the Bank had not notified certificateholders or rating agencies of an Event of Default. (*Id.* ¶ 81.)

---

[7] The parties to the Settlement Agreement are the Bank, Bank of America Corporation (Countrywide's successor by *de facto* merger), BAC Home Loans Servicing, LP, Countrywide Financial Corporation, and Countrywide Home Loans, Inc. (R. 82-1, Settlement Agreement.)

The certificates that Sterling holds are part of the 530 trusts that are the subject of the Settlement Agreement. (*Id.* ¶ 82.) Sterling alleges that the Bank negotiated the Settlement Agreement "in secret" without Sterling's knowledge or consent, and that, if approved, it would "extinguish claims the Bank could bring against Countrywide and its affiliates and Bank of America and its affiliates as successor." (*Id.*) The Settlement Agreement is contingent upon court approval. (*Id.* ¶¶ 80, 82.)

On the day that the Bank announced the Settlement Agreement, it also filed a proceeding in the Supreme Court of the State of New York under Article 77 of the New York Civil Practice Law and Rules, requesting judicial approval of the proposed settlement (the "Article 77 Proceeding"). (*Id.* ¶ 80; R. 82-2, Verified Pet.) Article 77 "authorizes a special proceeding 'to determine a matter relating to any express trust . . . .'" *BlackRock*, 673 F.3d at 174 (citing N.Y. C.P.L.R. 7701). As the Second Circuit recently explained, "[p]ermissible uses of Article 77 'are broadly construed to cover any matter of interest to trustees, beneficiaries or adverse claimants concerning the trust.'" *Id.* (citing *Greene v. Greene (In re Greene)*, 88 A.2d 547, 451 N.Y.S.2d 741, 743 (1st Dep't 1982)). "Such proceedings are used by trustees to obtain instruction as to whether a future course of conduct is proper, and by trustees (and beneficiaries) to obtain interpretations of the meaning of trust documents." *Id.* (citing cases). In the Article 77 Proceeding, the Bank seeks a judgment that, among other things:

> 1) "Pursuant to the Governing Agreements and applicable law, the decision whether to enter into the Settlement Agreement on behalf of all Trust Beneficiaries, the Covered Trusts, and any Persons . . . is a matter within the Trustee's discretion."

> 2) "The Settlement Agreement is the result of factual and legal investigation by the Trustee . . . ."

12

3) "The Trustee appropriately evaluated the terms, benefits, and consequences of the Settlement and the strengths and weaknesses of the claims being settled."

4) The Bank "has the authority, pursuant to the Governing Agreements and applicable law" "to assert, abandon, or compromise" claims belonging to the trusts and enter into the Settlement Agreement on behalf of the trusts and trust beneficiaries; and

5) The Bank had "acted in good faith, within its discretion, and within the bounds of reasonableness in determining that the Settlement Agreement was in the best interests of the Covered Trusts."

(R. 82-3, Verified Pet. at Ex. F, Proposed Final Order and Judgment §§ f-k.)

Certain investors intervened in the Article 77 Proceeding and removed it to the United States District Court for the Southern District of New York (the "District Court") under the Class Action Fairness Act, Pub. L. No. 109–2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) ("CAFA").[8]  The District Court thereafter denied the Bank's motion to remand the case to state court.  *See Bank of New York Mellon v. Walnut Place LLC*, No. 11 Civ. 5988, 2011 WL 4953907, at *11 (S.D.N.Y. Oct. 19, 2011).  The Bank appealed the decision pursuant to CAFA's interlocutory appeal provision.  On appeal, the Second Circuit reversed and instructed the District Court to remand the case back to state court, where the proceeding is now pending.  *See BlackRock*, 673 F.3d at 173.

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted."  *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  "The issue is not whether a plaintiff will

---

[8] The Institutional Investors, which sent the Notice, are now aligned with the Bank in the Article 77 Proceeding.  *See Blackrock*, 673 F.3d at 173-74; *see also* R. 82-3, Verified Pet. at Ex. F § h.

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

*AnchorBank*, 649 F.3d at 614 (internal quotation and citation omitted). Pursuant to Rule 8(a)(2),

a complaint must include "a short and plain statement of the claim showing that the pleader is

entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of

what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555,

127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct.

99, 2 L. Ed. 2d 80 (1957)).

"In evaluating the sufficiency of the complaint, [courts] view it in the light most

favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all

possible inferences from the allegations in the plaintiff's favor." *AnchorBank,* 649 F.3d at 614.

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted

as true, to state a claim to relief that is plausible on its face . . . . A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Indep. Trust Corp. v. Stewart Info.*

*Servs. Corp*., 665 F.3d 930, 934-35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.

Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks omitted)). "The complaint

'must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a

right to relief above the speculative level.'" *Id.* at 935 (citing *Windy City Metal Fabricators &*

*Supply, Inc. v. CIT Tech. Fin. Servs*., 536 F.3d 663, 668 (7th Cir. 2008) (emphasis in original)).

"[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may

proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a

recovery is very remote and unlikely.'" *Id.* (citing *Twombly*, 550 U.S. at 556 (internal quotation

14

omitted)). "To meet this plausibility standard, the complaint must supply 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Id.* (citing *Twombly*, 550 U.S. at 556). "The required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011) (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)).

## ANALYSIS

### I.     The Court Will Consider Certain Matters Outside of the Pleadings

Before reaching the merits of the Bank's arguments, the Court briefly addresses the scope of its review. A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the pleadings, and as such, the Court's "consideration of matters outside the pleadings is not generally permitted," unless the Court converts the motion into one for summary judgment pursuant to Rule 12(d). *See Mclntyre v. McCaslin*, No. 11 C 50119, 2011 WL 6102047, at *4 (N.D. Ill. Dec. 7, 2011) (citing, *inter alia*, *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)). An exception to this general rule exists where the parties present records "to which the Complaint . . . refer[s]" and that are "concededly authentic," and "central" to the claims presented. *See Hecker v. Deere & Co.*, 556 F.3d 575, 582 (7th Cir. 2009); *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661-62 (7th Cir. 2002). Another exception includes documents that are attached to the Complaint. *See* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("Because the letter was attached to the complaint, it became a part of it for all purposes, and so the judge could consider it in deciding the motion to dismiss without having to convert the motion to one for summary judgment.") (internal citations

omitted). Additionally, courts may take judicial notice of documents filed in another court "as long as that document is offered to show what was stated to the court rather [than] for the truth of the matter asserted." *Sledge v. Bellwood Sch. Dist. 88*, No. 09-cv-4186, 2010 WL 1579920, at *4 (N.D. Ill. April 20, 2010) (citing *Opoka v. I.N.S.*, 94 F.3d 392, 395 (7th Cir. 1996)).

Here, Sterling's Complaint contains 13 exhibits: published prospectuses (the "Prospectuses") regarding the sale of the certificates as to the four Trusts (Exhibits A, B, C and D); Prospectus supplements regarding the sale of certificates as to the four Trusts ("Prospectus Supplements") (Exhibits E, F, G, and H); PSAs for the four Trusts (Exhibits I, J, K, and L); and the October 18, 2010 Notice (Exhibit M). Pursuant to Seventh Circuit precedent, the Court will consider these documents, to the extent they are relevant, in deciding the motion to dismiss. *See Tierney*, 304 F.3d at 738.

The Bank also attaches several exhibits to its memorandum of law in support of its motion to dismiss, including the Settlement Agreement (Exhibit A); the Bank's Verified Petition in the Supreme Court of the State of New York, Index No. 651786/2011 (Exhibit B); a document entitled "Countrywide RMBS Effort: Gibbs & Bruns LLP Issues Statement," dated March 31, 2011 (Exhibit C); accounting statements dated November 22, 2011 for Countrywide Home Loans Servicing LP CHL Mortgage Pass-Through Trust Series 2004-15 (Exhibit D); and accounting statements dated November 25, 2011 for Countrywide Home Loans CHL Mortgage Pass-Through Trust Series 2004-22 (Exhibit E).

The Court will consider the Verified Petition, to which the Complaint refers (*see* TAC ¶ 80), not for the truth of the matters asserted therein, but rather to show what the Bank has represented to the New York court. *See Sledge*, 2010 WL 1579920, at *4. The Court will not

16

consider the remaining documents, including the accounting statements for the trusts at issue and the document entitled "Countrywide RMBS Effort: Gibbs & Bruns LLP Issues Statement." Those documents do not fit within the exceptions explained above, and thus are improper for consideration on a motion to dismiss. Although the Settlement Agreement is the basis for two of Sterling's claims against the Bank and is referenced throughout the Complaint, the Court does not need to consider the Settlement Agreement in deciding the Bank's motion to dismiss, so the Court need not decide whether it may appropriately do so.

Sterling attaches three additional documents to its response brief, all of which are documents from the record in the Article 77 Proceeding. Specifically, Sterling attaches the Bank's "Memorandum of Law in Support of the Trustee's Motion Regarding the Standard of Review and Scope of Discovery" (R. 84-1), Sterling's "Notice of Intention to Appear and Object to Settlement" (R. 84-2), and certain investors' "Memorandum of Law in Support of Order to Show Cause Why the Court Should Not Covert This Special Proceeding to a Plenary Action." (R. 84-3). The Court will consider these documents to the same extent as the Verified Petition, for the reasons stated above. *See Sledge*, 2010 WL 1579920, at *4.

## II. Sterling's Breach of Fiduciary Duty Claims (Counts I and II) Are Stayed Pending Final Disposition of the Article 77 Proceeding

Count I of Sterling's Complaint alleges that the Bank breached its fiduciary duty to Sterling and other certificateholders by failing to investigate the Master Servicer's non-performance of its obligations under the PSAs, after the Bank had actual knowledge of an Event of Default, and by failing to make demands on the Master Servicer and suing if the demands were not met. (TAC ¶¶ 98-100.)

In Count II, Sterling alleges that the Bank breached its fiduciary duty to certificateholders, including Sterling, by failing to enter into a reasonable and fair settlement agreement that protects the interests of certificateholders. (*Id.* ¶¶ 82-84, 112-115.) Specifically, Sterling contends that the Settlement Agreement is not fair and reasonable because it 1) delays servicing improvements and the cure of the Master Servicer's breaches of the PSAs; 2) ties servicing improvements to court approval of the monetary portion of the settlement; and 3) allows the Master Servicer to walk away from the servicing improvement obligations in the event that the court does not approve the settlement. (*Id.* ¶¶ 113-14.) Sterling alleges that the Bank failed to act in the interest of the certificateholders and instead acted in its own interest to settle the trusts' claims in order to "reduce or extinguish its potential liability to Certificateholders." (*Id.* ¶ 115.)

The Bank argues that the Court should dismiss, or in the alternative, stay, Counts I and II of Sterling's Complaint under the *Colorado River* doctrine of abstention because they are duplicative of issues pending before the New York Supreme Court in the Article 77 Proceeding. Sterling disagrees, contending that the *Colorado River* doctrine does not apply in this case.

### A.    The *Colorado River* Doctrine

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Tyrer v. City of S. Beloit*, 456 F.3d 744, 750-51 (2006) (quoting *Colorado River*, 424 U.S. 800 at 817). In general, "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court.'" *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 645 (7th Cir. 2011) (quoting *Colorado River*, 424 U.S. at 817). The *Colorado River* doctrine, however, permits a federal court to abstain from exercising its jurisdiction over a

case when the same case is concurrently pending in state court in certain "exceptional circumstances." *See Colorado River*, 424 U.S. at 813.

District courts must undertake a two-part inquiry in deciding whether abstention is appropriate under the *Colorado River* doctrine. First, the court determines whether the concurrent state and federal actions are parallel. *Tyrer*, 456 F.3d at 751. If the actions are parallel, the court must then consider a number of non-exclusive factors to determine whether "exceptional circumstances" exist. *Id.* Courts have discretion to determine whether to stay a proceeding under the *Colorado River* doctrine. *Id.*

**B.      Counts I and II and the Article 77 Proceeding are Parallel**

The Court first addresses whether Counts I and II of Sterling's Complaint and the Article 77 Proceeding are parallel.[9] The Seventh Circuit teaches that two proceedings may be parallel even whether there is no "formal symmetry between the two actions." *Tyrer*, 456 F.3d at 752 (citing *Clark v. Lacy*, 376 F.3d 682, 686 (7th Cir. 2004)); *Adkins*, 644 F.3d at 499 ("Precisely formal symmetry is unnecessary."). "Generally, a 'suit is parallel when substantially the same parties are contemporaneously litigating substantially the same issues in another forum.'" *Tyrer*, 456 F.3d at 752 (quoting *Interstate Material Corp. v. City of Chicago*, 847 F.2d 1285, 1288 (7th Cir. 1988)). District courts should consider "whether the suits involve the same parties, arise out of the same facts and raise similar factual and legal issues." *Adkins*, 644 F.3d at 499 (quoting *Clark*, 376 F.3d at 686); *Tyrer*, 456 F.3d at 752 (citing *Clark*, 376 F.3d at 686). The critical issue is "whether there is a substantial likelihood that the state litigation will dispose of all

_____

[9] The Bank does not argue that Counts III-V of Sterling's Complaint are parallel to the Article 77 Proceeding.

19

claims presented in the federal case." *Huon*, 657 F.3d at 646 (quoting *Adkins*, 644 F.3d at 499).

**1.     The Article 77 Proceeding and Counts I and II of Sterling's Complaint involve substantially the same issues**

The Article 77 Proceeding is duplicative of Count II, in which Sterling seeks a finding

that the Bank breached its fiduciary duty by entering into an unfair and unreasonable settlement

agreement.  In the Article 77 Proceeding, the Bank seeks findings that, among other things,

(1) the Bank acted within its discretion as Trustee and in accordance with applicable law in

settling the claims against the Seller and the Master Servicer, and (2) the Settlement Agreement

is fair and reasonable.  (R. 84-3, Verified Pet. at Ex. F §§ f-k.)  In other words, Sterling seeks the

exact opposite findings in Count II that the Bank seeks in the Article 77 Proceeding.  Indeed,

Sterling has raised the same arguments regarding the reasonableness of the Settlement

Agreement in its Complaint in this case and in its objection in the Article 77 Proceeding.

*Compare* TAC ¶¶ 110-117 with R. 84-2, Sterling's Notice of Intention to Appear and Object to

Settlement ¶¶ 4-10.

As such, not only will the Article 77 Proceeding involve the same factual and legal issues

as Count II, *see Adkins*, 644 F.3d at 499, it will also dispose of Count II.  *See Huon*, 657 F.3d at

646.  Moreover, Count II would require the Court to consider the same evidence, and undertake

the same analysis, as the New York Supreme Court in the Article 77 Proceeding.  *See id.* at 647

("One important factor is whether both cases would be resolved by examining largely the same

evidence."); *Tyrer*, 456 F.3d at 753 (holding that the *Colorado River* doctrine applied where "the

legal and factual analysis required to resolve the state-court claims is substantially similar to the

analysis the federal court would undertake in evaluating the plaintiff's claims").

As to Count I, the answer is the same. Sterling seeks a finding in Count I that the Bank breached its fiduciary duty by failing to (1) investigate the Master Servicer's non-performance of its obligations under the PSAs; (2) demand that the Master Servicer enforce the Seller's obligations under the PSAs; and (3) sue if those demands were not met. (TAC ¶¶ 98-100.) In the Article 77 Proceeding, the Bank seeks findings that, pursuant to the PSAs and applicable law, it (1) has the authority to "assert, abandon, or compromise" claims belonging to the trusts and to enter into the Settlement Agreement on behalf of the trusts; (2) has the discretion to enter into the Settlement Agreement; (3) the Settlement Agreement is the result of the Bank's legal and factual investigation and that it appropriately evaluated the terms, benefits, and consequences of the Settlement and the strengths and weaknesses of the claims being settled; and (4) the Bank acted in good faith and within its discretion in determining that the Settlement Agreement is in the best interests of the trusts. (R. 82-3 at Ex. F §§ f-k; R. 82-2, Verified Pet. ¶¶ 35, 59, 68-92); *see also BlackRock,* 673 F.3d at 178 (explaining that, in the Article 77 Proceeding, the Bank "seeks a construction of its rights under the PSA and an instruction from the court as to whether it has complied with its 'duties . . . and obligations' arising from the PSA and its 'fiduciary duties' superimposed by state law").

As such, the issue of whether the Bank acted in accordance with its obligations under the PSAs and state law in investigating and choosing to settle claims against the Master Servicer and the Seller, rather than litigating those claims, is directly present in both proceedings. *See Tyrer*, 456 F.3d at 753 (noting that the Seventh Circuit has "repeatedly held that two actions are 'parallel' where the underlying issues are the same, even if they have been 'repackag[ed] . . . under different causes of action'") (quoting *Clark*, 376 F.3d at 687). The New York court's

21

decision with respect to the reasonableness of the Bank's investigation and decision to settle the Trusts' claims against the Master Servicer and the Seller will resolve the issue of whether the Bank breached its fiduciary duty by failing to make demands on the Master Servicer and failing to sue if the demands were not met. *See Huon*, 657 F.3d at 646 (noting that proceedings are parallel where the state court action resolves the dispute pending before the federal court). Therefore, Count I involves the same issues as the Article 77 Proceeding.

Sterling contends that the Article 77 Proceeding and "this action" involve different issues because the Article 77 Proceeding relates to "only those claims the Bank could have asserted against various Countrywide entities for breaches of the PSAs," whereas "this action solely concerns the Bank's breaches of its obligations under the PSAs." (R. 84, Sterling's Resp. at 7-8, 10.) The Court disagrees.

First, to the extent Sterling argues that Counts III, IV, and V do not parallel the Article 77 Proceeding, that argument is irrelevant because Sterling does not ask the Court to abstain from hearing those Counts. Second, Sterling's contention that "this action solely concerns the Bank's breaches" of the PSAs is incorrect because only Counts III, IV, and V of Sterling's Complaint allege claims for breach of contract. The counts that are subject to abstention–Counts I and II–are not actions for breach of contract. Rather, as noted above, those counts allege breach of fiduciary duties related to the Bank's decision to settle claims against the Master Servicer and Seller and the circumstances surrounding that settlement. Finally, Sterling's argument confuses the issues that the Bank seeks to resolve in the Settlement Agreement with the issues that the Bank asks the New York court to resolve in the Article 77 Proceeding. Specifically, the Settlement Agreement, if approved, would resolve the Bank's potential claims against various

22

Countrywide entities, but the Article 77 Proceeding concerns separate and distinct issues–namely, whether the Bank's decision to enter into the Settlement Agreement on behalf of the Trusts was within the bounds of its discretion and in accordance with its duties under the law. *Cf. BlackRock*, 673 F.3d at 179 (rejecting a certificateholders' argument that the Article 77 Proceeding, which concerns the Bank's "rights, duties, and obligations," is the same as "the underlying claim resolved in the Settlement Agreement: a claim by [the Bank] against Countrywide and Bank of America to enforce the buy-back provisions of the PSA"). The Article 77 Proceeding therefore involves the same issues as Counts I and II.

### 2. The Article 77 Proceeding and this case involve substantially the same parties

The Bank initiated the Article 77 Proceeding, and is therefore a party to that proceeding. Sterling argues that because it has not officially "intervened" in the Article 77 Proceeding, but rather is only an "objector," such proceeding involves different parties than this case. (R. 84, Sterling's Resp. at 9.) Sterling does not, however, cite to any legal authority distinguishing between an "intervenor" and an "objector" for purposes of determining whether the actions involve the same parties under the *Colorado River* doctrine. Indeed, as the Bank points out, Sterling has filed a "Notice of Intention to Appear and Object to Settlement" in the Article 77 Proceeding, and the Bank has not objected to Sterling's participation in the proceeding. There is no indication that the New York court has not, or will not, allow Sterling to meaningfully participate in the Article 77 Proceeding. Additionally, as is apparent from the Second Circuit's decision in *BlackRock*, several investors who have nearly identical interests have officially intervened in the Article 77 Proceeding to contest approval of the Settlement Agreement. *See BlackRock*, 673 F.3d at 174-75 (explaining that the New York Supreme Court granted certain

23

investors' motion to intervene and that those investors argued, among other things, that the Bank had negotiated the Settlement Agreement "in secret" and that the parties had conflicts of interest).

Under these circumstances, even if Sterling's status as an objector rather than an intervenor was of consequence in determining the parties involved in the Article 77 Proceeding, it would not necessarily preclude the application of the *Colorado River* doctrine in this case. *See Beck v. Dobrowski*, 559 F.3d 680, 686 (7th Cir. 2009). In *Beck*, the plaintiff investor sued certain directors for breach of fiduciary duty in federal court. *Id.* Certain other investors had initiated a breach of fiduciary action in state court against the directors, which was identical to the plaintiff's claim in federal court. The Seventh Circuit agreed with the district court that *Colorado River* abstention was appropriate even though the federal court plaintiff was not a party to the state court proceeding. *Id.* An opposite result, the Seventh Circuit noted, would mean that "different members of what should be a single class could file identical suits in federal and state courts to increase their chances of a favorable settlement." *Id.*; *see also Clark*, 376 F.3d at 686 ("Parties with 'nearly identical' interests are considered 'substantially the same' for *Colorado River* purposes.") (citation omitted). The same reasoning applies in this case. As such, the Article 77 Proceeding and Counts I and II of Sterling's Complaint are parallel.

### C.    Exceptional Circumstances Exist

The next question under *Colorado River* is whether "exceptional circumstances" justifying abstention exist. *See Tyrer*, 456 F.3d at 751. The Seventh Circuit instructs that courts should consider the following ten factors when determining whether exceptional circumstances exist:

       1) whether the state has assumed jurisdiction over property;
       2) the inconvenience of the federal forum;
       3) the desirability of avoiding piecemeal litigation;
       4) the order in which jurisdiction was obtained by the concurrent forums;
       5) the source of governing law, state or federal;
       6) the adequacy of [the] state-court action to protect the federal plaintiff's rights;
       7) the relative progress of state and federal proceedings;
       8) the presence or absence of concurrent jurisdiction;
       9) the availability of removal; and
       10) the vexatious or contrived nature of the federal claim.

*Id.* at 754 (citing *Caminiti & Iatarola, Ltd. v. Behnke Warehousing, Inc*., 962 F.2d 698, 701 (7th Cir. 1992)).

      "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." *Colorado River*, 424 U.S. at 818; *see also Adkins*, 644 F.3d at 500 ("These factors are not meant to be a 'mechanical checklist,' but require careful balancing by the federal district court.") (citation omitted). "'The weight to be given to any one factor may vary greatly from case to case, depending on the particular setting of the case,' but in any case, the evaluation must be made 'with the balance heavily weighted in favor of the exercise of jurisdiction.'" *Adkins*, 644 F.3d at 500 (quoting *Moses H. Cone Memorial Hosp*., 460 U.S. 1, 16, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983)); *see also Tyrer*, 456 F.3d at 751 (noting that there is a "general presumption against abstention") (citing *AXA Corp. Solutions v. Underwriters Reins. Corp*., 347 F.3d 272, 278 (7th Cir. 2003)). "[B]ecause of the presumption against abstention, absent or neutral factors weigh in favor of exercising jurisdiction." *Huon*, 657 F.3d at 648 (citations omitted). The Court examines each of these factors in turn.

### 1. Whether the state court has assumed jurisdiction over property

Because Counts I and II do not involve property, this factor is absent and thus weighs against abstention.

### 2. Inconvenience of the federal forum

This factor is also neutral and therefore weighs against abstention. *Id.* The Bank argues that New York is a more convenient forum for the parties' dispute in Counts I and II, but it does not set forth any reasons why Illinois is an inconvenient forum. Moreover, the Bank has not contested venue in this Court with respect to Counts III, IV, and V of Sterling's Complaint, and indeed, the Bank will be required to litigate those counts in this Court regardless of whether the Court determines that the *Colorado River* doctrine applies to Counts I and II.

### 3. The desirability of avoiding piecemeal litigation

This factor weighs heavily in favor of abstention. The Article 77 Proceeding provides a single mechanism for the New York court to consider all interested certificateholders' objections, including Sterling's objection, to the Settlement Agreement. *See Colorado River*, 424 U.S. at 819-20 (avoidance of piecemeal litigation factor weighed in favor of state court proceeding where the policy evinced by the law at issue was the avoidance of piecemeal adjudication of water rights in a river system). As discussed above, Sterling seeks findings in Counts I and II that are opposite to those that the Bank seeks in the Article 77 Proceeding. Indeed, Sterling has asserted the very same arguments against the propriety of the Settlement Agreement in the Article 77 Proceeding as it has in this litigation. *See Tyrer*, 456 F.3d at 755 ("Piecemeal litigation occurs when different tribunals consider the same issue, thereby duplicating efforts and possibly reaching different results.") (quoting *LaDuke v. Burlington N.R.*

*Co.*, 879 F.2d 1556, 1560 (7th Cir. 1989)). If this Court were to consider and decide the merits of Counts I and II, it would not only run afoul of the purpose of the Article 77 Proceeding, it would also waste judicial resources. *Id.* at 755 (noting that the "danger of piecemeal litigation . . . [turns] on concerns about the efficient use of judicial resources and the public's perception of the legitimacy of judicial authority"). Moreover, it may encourage other certificateholders to file separate actions in federal court, which would further undermine the efficacy and legitimacy of the Article 77 Proceeding and may also lead to inconsistent outcomes.[10] *See id.* at 757 ("Not only would duplicative litigation waste judicial resources, but it also would create an undue risk of conflicting final judgments on the merits of [the plaintiff's] claims.").

### 4. The order in which the concurrent forums obtained jurisdiction

This factor also weighs in favor of abstention. Although Sterling filed its initial complaint against the Bank and others in this Court before the Bank initiated the Article 77 Proceeding on June 28, 2011, Sterling did not assert Counts I and II against the Bank until its Second Amended Verified Certificateholder Derivative Complaint, which it filed on December 5, 2011. (R. 60.) Therefore, the Court did not obtain jurisdiction over Counts I and II until December 5, 2011, almost six months after the Bank initiated the Article 77 Proceeding and several months after Sterling filed its substantive objection to the Settlement Agreement in that proceeding. (R. 84-2, Sterling's 8/29/2011 Obj.)

---

[10] As the Bank points out, this concern has already materialized. Certificateholders, whom Sterling's attorneys represent, have asserted claims against the Bank in the United States District Court for the Middle District of Florida, which mirrors, almost verbatim, Counts I and II of Sterling's Complaint. *See Bankers Ins. Co. v. Countrywide Fin. Corp.* (M.D. Fla., 11-cv-1630) at R. 9 (Am. Compl.).

### 5. The source of governing law

This factor, too, weighs in favor of abstention. The parties agree that New York law applies in this case. As the Seventh Circuit teaches, "state courts are the authoritative expositors of their own state's laws." *Beck*, 559 F.3d at 686. The Court is not convinced by Sterling's argument that the Court should view this factor as neutral because "the source of law in the Article 77 proceeding is very unique and seldom applied New York statutory law." (R. 84, Sterling's Resp. at 14.) The relevant law for purposes of this case is New York fiduciary duty law, as that is the source of Sterling's breach of fiduciary duty claims in Counts I and II. As in *Clark*, the Court determines here that "it makes more sense to allow a New York state court to resolve" questions of New York law. 376 F.3d at 687-88; *see also Bank of Am. v. Zahran*, No. 10 C 4461, 2011 WL 167241, *4 (N.D. Ill. Jan 19, 2011) ("The source of the governing law here is state law, which favors abstention.").

### 6. The adequacy of the state court action to protect the federal plaintiff's rights

This factor also weighs in favor of abstention. As explained above, Sterling has objected to the Settlement Agreement in the Article 77 Proceeding, and other investors have intervened in that proceeding and raised arguments that are substantially similar to Sterling's. Sterling's sole argument as to why the Article 77 Proceeding is insufficient to protect its rights is that "regardless of whether the state court approves the proposed settlement[,] the Article 77 Proceeding will not resolve Sterling's claims against [the Bank]." (R. 84, Sterling's Resp. at 14.) The Court, however, has already addressed and rejected that argument. Moreover, in the event that after the final disposition of the Article 77 Proceeding, Sterling still believes that the issues

it raises in Counts I and II are outstanding, it may attempt to raise those issues after the Court lifts the stay.

### 7. The relative progress of the state and federal proceedings

Despite Sterling's argument to the contrary, this factor weighs in favor of abstention. The parties dispute the extent to which discovery has taken place in the Article 77 Proceeding, but they both agree that at least some has taken place. No discovery has occurred in this case. Additionally, the Bank represents, and Sterling does not contest, that the New York court recently indicated that fact discovery will conclude in October 2012 and that a hearing will take place by February 2013. (R. 89, Bank's Mem. of Law at 9.) "At the very least, the controversy appear[s] to be closer to a resolution in the state proceedings than the federal," *Tyrer*, 456 F.3d at 756 (internal quotation marks omitted), and therefore this factor weighs in favor of abstention. *See Colorado River*, 424 U.S. at 820 (finding that a significant factor weighing in favor of dismissal of federal court proceeding was "the apparent absence of any proceedings in the District Court, other than the filing of the complaint, prior to the motion to dismiss").

### 8. The presence or absence of concurrent jurisdiction.

Sterling concedes that the New York state court and this Court have concurrent jurisdiction. (R. 84, Sterling's Resp. at 15.) This factor favors abstention.

### 9. The availability of removal

Sterling also concedes that this factor favors abstention because the Second Circuit recently instructed the district court to remand the action to the New York Supreme Court, where it is now pending. *See Blackrock*, 673 F.3d at 180.

### 10. The vexatious or contrived nature of the federal claim

Although it is suspicious that despite filing two complaints, Sterling did not assert Counts I and II until its third complaint–which it filed well after the Bank initiated the Article 77 Proceeding and after Sterling made substantially similar arguments in objection to the Settlement Agreement in that action–the Court does not have sufficient information from which to conclude that Sterling's claims in Counts I and II are "vexatious" or "contrived."  Accordingly, this factor is neutral and therefore weighs against abstention.

### 11. Conclusion

In light of the above factors, the majority of which–both in quantity and quality–weigh in favor of abstention, the *Colorado River* doctrine applies to Counts I and II of Sterling's Complaint.  In accordance with the general practice in the Seventh Circuit to order a stay, rather than a dismissal without prejudice, when determining that abstention is appropriate under the *Colorado River* doctrine,[11] Counts I and II of Sterling's Complaint are stayed pending final disposition of the Article 77 Proceeding.

## III. Sterling Adequately Alleges Claims for Breach of Contract (Counts III, IV, and V)

Counts III, IV, and V of Sterling's Complaint assert claims for breach of contract. Specifically, Sterling, on behalf of 2004-15, 2004-22, 2005HYB6, and 2006-26CB, alleges in Count III that the Bank breached § 7.03 of the PSAs by failing to provide the certificateholders

---

[11] *See, e.g., Adkins v. VIM Recycling, Inc*., 644 F.3d 483, 508 (7th Cir. 2011) (Ripple, J., concurring in part and dissenting in part) (citing *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 698 (7th Cir. 1985)); *Selmon v. Portsmouth Drive Condo. Ass'n*, 89 F.3d 406, 409-10 (7th Cir. 1996); *Rogers v. Desiderio*, 58 F.3d 299, 302 (7th Cir. 1995); *LaDuke v. Burlington N. Ry. Co.*, 879 F.2d 1556, 1561-62 (7th Cir. 1989); *Rosser v. Chrysler Corp.*, 864 F.2d 1299, 1308 (7th Cir. 1988).

with notice of an Event of Default of which it had actual knowledge. (TAC ¶¶ 120-22.) Sterling

alleges that the Event of Default arose by virtue of the Master Servicer's breaches of §§ 3.01,

3.09, 3.11(a)-(b), and 3.14 of the PSAs. (*Id.* ¶ 122.)

In Counts IV and V, Sterling alleges that the Bank breached § 4.06 and § 8.01 of the

PSAs by failing to provide monthly statements to rating agencies (Count IV) and

certificateholders (Count V) regarding the Special Hazard Loss Coverage Amount, the Fraud

Loss Coverage Amount, and the Bankruptcy Loss Coverage Amount as of the Determination

Date. (*Id.* ¶¶ 129-132 (Count IV), ¶¶ 140-43 (Count V).[12]) Sterling also alleges that to the

extent that the Master Servicer did not provide such information to the Bank in accordance with

§ 4.06(c) of the PSAs, the Bank breached § 8.01 of the PSAs by failing to examine the Master

Servicer's reports to determine whether they conformed to the PSA's requirements. (*Id.* ¶ 133

(Count IV), ¶ 144 (Count V).)

### A.    Sterling Adequately Alleges an Event of Default

The Bank argues that Count III fails to state a claim because Sterling has not alleged that

an Event of Default occurred or that the Bank had actual knowledge of an Event of Default.

Both parties rely on the same provision of the PSAs–§ 7.01(ii)–in support of their respective

arguments. Section 7.01(ii) provides, in relevant part, that an Event of Default means:

---

[12] Paragraph 132 states that the Bank "breached § 4.06(a) of the PSAs by failing to provide monthly statements to *Certificateholders* . . . ," but it appears from the context of the statement and from Sterling's briefing on the Bank's motion to dismiss that Sterling meant to refer to rating agencies rather than certificateholders. (TAC, Count IV ("Breach of Contract Against BNYM (Monthly Statements to Rating Agencies)"); *id.* ¶ 131 (alleging that the Bank was required to provide monthly statements to rating agencies under § 4.06 of the PSAs); ¶ 143 (alleging, under Count V, that the Bank breached § 4.06(a) by failing to provide monthly statements to Certificateholders).)

> any failure by the Master Servicer to observe or perform in any material respect
> any other of the covenants or agreements on the part of the Master Servicer
> contained in this Agreement, which failure materially affects the rights of
> Certificateholders, that failure continues unremedied for a period of 60 days after
> the date on which written notice of such failure shall have been given to the
> Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the
> Trustee by the Holders of Certificates evidencing not less than 25% of the Voting
> Rights evidenced by the Certificates . . . ."

(PSA § 7.01(ii).) Accordingly, under this provision, an "Event of Default" occurs if the Trustee

receives written notice of the Master Servicer's material breach of the PSA and such breach

continues, unremedied, for a period of 60 days after the date of the written notice. *Id.* Pursuant

to the PSAs, the Bank "shall not be deemed to have knowledge of an Event of Default until a

Responsible Officer of the Trustee shall have written notice thereof." (*Id.* § 8.02(viii).)

In its Complaint, Sterling alleges that "[o]n October 18, 2010, a group of

certificateholders (the "Institutional Investors") holding no less than 25% of the Voting Rights in

certificates issued by 115 trusts, including 2004-22, provided the Bank and [the Master Servicer]

notice of [the Master Servicer's] failure to observe and perform, in material res[p]ects, the

covenants and agreements imposed on it by § 7.01(ii) of the PSAs." (TAC ¶ 75.) Specifically,

the Notice provided that the Master Servicer had failed and refused to perform numerous

obligations, in breach of §§ 2.03(c), 3.01, 3.11(a), 3.11, and 3.14 of the PSAs. (*Id.* ¶ 76.) The

Notice further informed the Bank and the Master Servicer that such failures were in violation of

the Master Servicer's obligations under § 3.01 of the PSAs and that each failure materially

affected the certificateholders' rights and that the failures were continuing. (*Id.* ¶ 77.) Finally,

the Institutional Investors notified the Bank and the Master Servicer that if the failures to

perform continued for an additional sixty days from the date of the Notice, then each failure

would constitute an Event of Default pursuant to § 7.01 of the PSAs. (*Id.*) According to

Sterling's Complaint, the failures to perform continued for an additional 60 days from the Notice date and therefore created an Event of Default pursuant to § 7.01(ii) of the PSAs. (*Id.* ¶ 78.) These allegations support a reasonable inference that an Event of Default occurred and that the Bank had actual knowledge of such Event of Default by virtue of the Notice, which was in writing. *See Independent Trust Corp.*, 665 F.3d at 934-35.

The Bank argues that Sterling has not alleged that an Event of Default occurred because Sterling has not alleged that a "60-day period expired without a cure" because "the cure period [was] tolled during the negotiations that ultimately produced the Settlement Agreement." (R. 80, Bank's Mem. of Law at 15). The Bank asserts that the same investors who sent the Notice to the Bank and the Master Servicer have agreed that no Event of Default occurred. In support, the Bank relies on a "forbearance agreement," between those investors and the Bank, which is referred to in a statement that Gibbs & Bruns LLP issued on March 31, 2011 (the "Gibbs & Bruns Statement"). The Bank attached the Gibbs & Bruns Statement to its memorandum of law in support of its motion to dismiss. (R. 82-4, Gibbs & Bruns Statement.) As explained above, however, the Court may not consider the Gibbs & Bruns Statement at the motion to dismiss stage.

The Bank's tolling argument is unavailing at this stage in the litigation. As noted above, the Complaint specifically alleges that the failures to perform continued for 60 days past the Notice date, which, pursuant to the express terms of the PSAs, created an Event of Default. (TAC ¶ 78); *cf. Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*, No. 09 C 6904, 2010 WL 3324705, at *8 (N.D. Ill. Aug. 20, 2010) (finding that Sterling had not alleged an Event of Default where it did not allege that the Master Servicer's "alleged failings remained unremedied

for 60 days after it received notice in the manner prescribed by the PSAs").  The Bank's argument, which it asserts in defense to Sterling's claim, is not a proper basis for dismissal at the pleadings stage.  *See generally Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674-75 (7th Cir. 2009) ("a complaint need not anticipate and overcome affirmative defenses"); *Doe v. GTE Corp.*, 347 F.3d 655, 357 (7th Cir. 2003) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6); litigants need not try to plead around defenses.") (citation omitted).  The Bank's argument raises issues of fact, including, at a minimum, whether the forbearance agreements are valid as against Sterling, especially given Sterling's assertion that it never received notice of the forbearance agreements.  The Court cannot resolve issues of fact at this stage in the litigation.  *See Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 730 (7th Cir. 1999) ("fact-finding has no part in resolving a Rule 12(b)(6) motion") (citing *Johnson v. Revenue Mgmt. Corp.*, 169 F.3d 1057, 1059 (7th Cir. 1999)); *Thornton v. Hamilton Sundstrand Corp.*, No. 12 C 329, 2012 WL 1966022, at *4 (N.D. Ill. May 31, 2012) (denying motion to dismiss where the movant's argument turned on question of fact) (citation omitted).

The Court also rejects the Bank's assertion that Sterling has not alleged an Event of Default because the Master Servicer's failures did not "continue unremedied."  Specifically, the Bank argues that the Settlement Agreement, which requires certain "servicing improvements" indicates that the failures to comply with the PSAs about which the Institutional Investors complained in the Notice have been remedied.  (R. 89, Bank's Reply at 12.)  This argument fails because whether the failures "continued unremedied" for a period of 60 days after the Notice is an issue of fact, as is the issue of whether the Settlement Agreement remedied any of the failures identified in the Notice.  The Court cannot resolve those factual issues on a motion to dismiss.

*See Int'l Mktg.*, 192 F.3d at 730. Accordingly, Sterling has adequately alleged that an Event of Default occurred and that the Bank had actual knowledge of an Event of Default.

### B. Sterling Adequately Alleges That It Suffered Damages

The remaining issue is whether Sterling has adequately alleged that it suffered damages with respect to its breach of contract claims. There are four elements to a breach of contract claim under New York law: "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Schupak Gr. Inc. v. Travelers Cas. & Sur. Co. of Am.*, 425 Fed. App'x 23, 25 (2d Cir. 2011); *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996). Construing the allegations in Sterling's favor, as the Court must do at this stage of the litigation, Sterling has adequately alleged that, by virtue of its status as a certificateholder of the Trusts, it suffered damages as a result of the Bank's alleged breach of the PSAs explained in Counts III, IV, and V.

With respect to Counts III and V, Sterling alleges that the Bank's failure to provide notice of an Event of Default and complete information as required by the PSAs to certificateholders damaged the Trusts. (TAC ¶¶ 123, 145.) Sterling further alleges that had it and other certificateholders known that the Master Servicer was not properly performing its obligations under the PSAs, it and other certificateholders would have demanded the Bank to enforce the Master Servicer's obligations in an effort to avoid losses to the Trusts and would have demanded that the Bank terminate the Master Servicer. (*Id.* ¶ 125.) Additionally, had the Bank provided complete monthly statements as required by the PSAs, the information in those statements would have prompted certificateholders to make earlier demands on the Bank to investigate the facts in the statements, which allegedly would have resulted in preservation of the

35

Trusts' assets. (*Id.* ¶ 146.) Without such information, Sterling and other certificateholders allegedly did not know of the troubled state of the Trusts' assets and therefore did not know to issue a demand on the Bank. (*Id.* ¶¶ 123-24, 144-45.) These allegations plausibly suggest that Sterling and other certificateholders suffered damages as a result of the Bank's conduct in Counts III and V.

Likewise, Sterling has adequately alleged that it suffered damages as a result of the Bank's alleged breaches of the PSAs as pled in Count IV. In particular, Sterling alleges that had the Bank provided the required information to the rating agencies, the rating agencies would have issued downgrades earlier and less drastically, which would have signaled to certificateholders that there were problems with the Trusts' performance, which, in turn, would have prompted certificateholders to make demands on the Bank to investigate the facts or matters in the statements, thereby preserving the Trusts' assets. (*Id.* ¶¶ 136-37.)

The Court disagrees with the Bank's contention that Sterling's allegations fail to plausibly suggest that the Bank's alleged breaches of the PSAs caused it to suffer damages. The Bank argues that Sterling does not allege who specifically would have made demands on the Bank had the Bank complied with its obligations under the PSAs, and that Sterling does not allege how the Trusts' losses would have been avoided had the Bank complied with its obligations. These arguments, however, are misplaced in a breach of contract action, which is subject only to Rule 8's pleading requirements–not the heightened pleading requirements in Rule 9(b). *Cf. Anchorbank*, 649 F.3d at 615 (explaining that Rule 9(b) "ordinarily requires describing the 'who, what, when, where, and how' of the fraud).

The Bank invites the Court to consider the monthly reports that it provided to certificateholders, contending that because such reports disclosed the aggregate losses on each Trust, the Bank's failure to provide additional information to certificateholders was inconsequential. (R. 80, Bank's Mem. of Law at 26.) As explained above, however, the Court cannot properly consider the monthly reports at this stage in the litigation. Moreover, the Bank's arguments as to which loss amounts in the monthly reports are material to certificateholders speak to the merits of the case, not the sufficiency of Sterling's allegations. *See Sterling Fed. Bank, F.S.B. v. DLJ Mortg. Capital, Inc.*, No. 09 C 6904, 2011 WL 1792710, at *2 (N.D. Ill. May 11, 2011) (denying motion to dismiss, noting that causation is an issue of fact).

A plausible inference from Sterling's allegations is that had the Bank complied with its contractual obligations to notify certificateholders of an Event of Default and to provide them with complete monthly statements, Sterling or other certificateholders would have prompted the Bank to investigate the Master Servicer, which would have brought the malfeasance to light sooner and would have helped to mitigate the losses the Trusts suffered. Likewise, Sterling's allegations plausibly suggest that had the Bank complied with its contractual obligations to provide complete information to the rating agencies, the rating agencies would have downgraded their ratings of the Trusts' certificates sooner, which would have signaled to the certificateholders that something was amiss.

Such pleadings are not akin to the "threadbare" allegations that the Seventh Circuit found deficient in *Limestone Dev. Corp. v. Village of Lemont, Ill.*, 520 F.3d 797, 802 (7th Cir. 2008), a case on which the Bank relies. As Sterling explained in its response brief, "[t]he essence of [its] claim is not merely that the Bank failed to properly report on the state of the Trusts, but rather

37

that the Bank's failure to so report resulted in Certificateholders not knowing the true state of affairs concerning the Trusts' assets underlying their investment, which in turn, prevented Certificateholders, including Sterling, from taking action to mitigate their damages." (R. 84, Sterling's Resp. at 29.) This explanation is consistent with Sterling's allegations.

Because Sterling's Complaint "include[s] as much factual detail and argument as may be required to show that [Sterling] has a plausible claim," Sterling has properly pled the existence of damages as required for its breach of contract claims. *See Limestone Dev. Corp.*, 520 F.3d at 804 (explaining that "how many facts are enough will depend on the type of case" at bar). Issues of causation and the extent of any such damages are issues of fact that are not appropriately decided at this stage of the litigation. *See Sterling*, 2011 WL 1792710, at *2. Therefore, the Court denies the Bank's motion to dismiss Counts III, IV, and V.

## CONCLUSION

For the reasons set forth above, the Court denies the Bank's motion to dismiss Sterling's Complaint. The Court, however, stays Counts I and II pending final disposition of the Article 77 Proceeding. The parties are directed to file a joint report on whether discovery should go forward on Sterling's breach of contract claims in light of the stay of Counts I and II. If so, the parties should file an agreed discovery plan. The report is due on or before June 29, 2012.

DATED: June 21, 2012                                      ENTERED

 

 

_____
AMY J. ST. EVE
United States District Court Judge

38